IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Case No. 3:22-CR-117-TAV-JEM |
| | ) |
| **WIGBERT BANDIE** | ) |

## DEFENDANT BANDIE'S SENTENCING MEMORANDUM

Comes now the Defendant, Wigbert Bandie ("Mr. Bandie"), by and through counsel, and submits this Sentencing Memorandum and Motion for a Variance for this Court's consideration. Mr. Bandie requests this Honorable Court review the circumstances of his case pursuant to 18 U.S.C. § 3553(a) and impose a sentence of 24 months of incarceration, or in the alternative, at the bottom of the advisory sentencing guidelines.

### STATEMENT OF FACTS

On June 25, 2024, Mr. Bandie entered a guilty plea for Count One in the seven count Indictment.[1] He pled guilty to Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349.[2] Mr. Bandie now stands before the court awaiting sentencing. According to the Presentence Investigation Report (PSR) prepared by Tara R. Gray, United States Probation Officer, after proper adjustments and a three-level reduction for acceptance of responsibility under § 3E1.1(a), Mr. Bandie, regarding Count One of the Indictment, has a total offense level of 26 and is in criminal history category I.[3] The offense level and criminal history level afford Mr. Bandie a

---

[1] [Doc. 11].
[2] [Doc. 75, ¶ 10]
[3] [Doc. 75, ¶¶ 81, 86]

guideline sentencing range of 63 to 78 months.[4] For this charge, there is no mandatory minimum

sentencing range. Therefore, his total effective advisory guideline range is from 63 to 78 months.

During the previous five (5) fiscal years, similarly situated defendants with a Final Offense Level

of 26 and a Criminal History Category of I received an average sentence of 49 months and a mean

length of imprisonment of 48 months.[5] Regarding this, Mr. Bandie submits that a sentence of 24

months, or even less were the Court inclined to vary downward, would be sufficient to comply with

the directive of 18 U.S.C. § 3553(a) that the Court impose a sentence "sufficient, but not greater

than necessary" to comply with the purposes of sentencing. Mr. Bandie respectfully requests this

Honorable Court impose such a sentence.

## ANALYSIS

### I. Pursuant to 18 U.S.C. § 3553(a), a downward variance is appropriate in Mr. Bandie's case.

A district court's discretion is no longer limited by the guidelines since its matrix is now

considered merely advisory. *United States v. Booker*, 543 U.S. 220, 245-67 (2005). A court is now

unencumbered by its ability "to consider every convicted person as an individual and every case as

a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United

States*, 518 U.S. 81 (1996)).

Congress has promulgated four purposes of sentencing: (1) punishment; (2) deterrence;

(3) incapacitation; and (4) rehabilitation. 18 U.S.C. § 3553(a)(2). To achieve these ends, Section

3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the

facts of the specific case to tailor a sentence in light of other statutory concerns. *Booker*, 543 U.S.

---

[4]

[5] [Doc. 75, ¶ 128].

2

at 757. The primary directive in Section 3553(a) is for sentencing courts to impose a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a)(2).

To accomplish these goals, courts analyze the facts of the specific case through the lens of seven (7) factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed . . .;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established . . .;
> (5) any pertinent policy statement . . .;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553 (a)(1)-(7).

While the guidelines remain important, they are just one of the numerous factors that a district court must consider when sentencing a defendant. *United States v. Webb*, 403 F.3d 373 (6th Cir. 2005). The sentencing court should consider the guideline range in combination with the Section 3553(a) factors before imposing a sentence. *United States v. McBride*, 434 F.3d 470, 475-76 (6th Cir. 2006). Against this backdrop of factors, Mr. Bandie contends that a downward variance is warranted in this case. *See United States v. Conner*, No. 24-3255, 2024 U.S. App. LEXIS 18753 (6th Cir. July 29, 2024) (where the district court granted a significant downward variance for a defendant who pled guilty to conspiracy to commit wire fraud, reducing his sentence from the guidelines estimated range of 41-51 months to only thirty (30) days in prison).

3

## A. The Nature and Circumstances of the Offense

Mr. Bandie's individual actions regarding the conspiracy are detailed in the PSR [Doc. 75, ¶¶ 40-63]. What remains unpublished is Mr. Bandie's immense guilt and regret for his minor role in the conspiracy, in which innocent victims were harmed. Mr. Bandie acknowledges that the betrayal and financial losses that the conspiracy is responsible for can be traumatizing to people who detrimentally believed in the lies.

However, Mr. Bandie contends that a sentence varied below the guideline range is warranted in his case because of his brief involvement in the conspiracy. *See United States v. Castellanos*, No. 8:03CR394, 2008 U.S. Dist. LEXIS 106140 (D. Neb. Dec. 29, 2008) (the relatively short time the defendant participated in the drug conspiracy supported a sentence of 180 months, rather than the 30 years to life guideline range); *See also United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (a below guideline sentence imposed in part because defendant did not participate in the conspiracy until its final months). A downward variance is further warranted because Mr. Bandie exercised only a minimal role in the offense. *See United States v. Cabrera*, 567 F. Supp.2d 271 (D. Mass. 2008) (where the district court granted a 3553(a) variance of 24 months to a defendant who had a minimal role in the conspiracy); *United States v. Ledezma*, No. 05-CR-289, 2007 U.S. Dist. LEXIS 87543 (E.D. Wis. Nov. 19, 2007) (where the district court granted a downward variance to one-day imprisonment based on defendant's lack of criminal history and minimal role in the crime); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (a 36-month downward departure given in child pornography case where the defendant was less culpable and deeply remorseful); *United States v. Gomez*, 215 F. App'x 200 (4th Cir. 2007) (upholding a

reduction of 20 months for defendant whose role was "a little less pronounced" and "a little less significant" than other defendants).

Mr. Bandie submits that his role in the conspiracy was minimal and that at no time has the United States alleged that Mr. Bandie personally received any financial gain from his slight involvement within the conspiracy. No proof has been presented that Mr. Bandie ever personally received any tangible financial benefits from this alleged scheme. Because Mr. Bandie's alleged involvement was sparce, a sentence of twenty-four (24) months would be sufficient but not greater than necessary to reflect the nature and characteristics of his brief and minor participation in the offense.

## B. The History and Characteristics of the Defendant

Mr. Bandie contends his history and characteristics warrant a downward variance from the recommended sentencing guideline range. Mr. Bandie was born in 1990 in Tamale, the capital city of the Northern Region of Ghana. Mr. Bandie's father earned a PhD in city planning and worked as a development consultant and university lecturer. His mother also served in education as a public middle school teacher. Through his parents' hard work and dedication to their family, Mr. Bandie and his brothers grew up in a safe and comfortable neighborhood, attending Catholic Mass every Sunday.

When Mr. Bandie was twelve (12) years old, a war ensued between rival fractions of the Dagomba people. Fighting broke out in a town nearby, closing schools immediately. The national government declared a state of emergency, which lasted over a year. Consequently, Mr. Bandie and his brothers did not return to school for several months. During this time, it was commonplace for Mr. Bandie to hear distant gun battles and see bloody fighters rummaging amongst the city.

Mr. Bandie later attended a Catholic, all boys boarding school, beginning in tenth grade. At this Seminary, he adhered to strict rules of discipline and served in leadership positions. Mr. Bandie credits his parents with instilling in him a fine example of hard work, academic achievement, and public service. Mr. Bandie recognizes that his selfish behavior in the instant case does not reflect the values he learned as a young person—to study hard, follow the law, and treat people with respect.

After high school graduation, Mr. Bandie took a customary gap year before attending a college university. He spent time working as a store attendant, where he began smoking cannabis. Unfortunately, this became a daily habit. This irresponsible behavior caused a rift between him and his father. With the continued rejection by his father, Mr. Bandie utilized cannabis as a medicine to help cope with the emotional pain. Because of continued substance and alcohol consumption, Mr. Bandie failed to graduate with his Bachelor of Science in Marketing degree at that time.

In 2015, Mr. Bandie reconciled with his father and relocated to Wa, the upper west region of Ghana, to provide caretaking and assistance to his father, who had recently suffered a paralyzing stroke. During this time, Mr. Bandie's first child, Maalu, was born. Committed to providing financial support for his daughter, Mr. Bandie formed "Boyemi Enterprises" to pursue multiple business projects. He sold salvaged automobiles in an online marketplace called Tonaton, as well as began a farming business, leasing thirty acres to grow maize, rice, and millet. Through his farming efforts, Mr. Bandie employed twenty farm workers to plough, plant, weed, and operate the tractors on the farm. Mr. Bandie prided himself with improving the lives of the local villagers in Upper West Ghana.

6

During the summer of 2010, Mr. Bandie was first exposed to online scams. While he did not begin involvement with online scams during this time, he observed others becoming profitable through these international online scams. It became so common in his area that most people accepted the online scams as a legitimate way to earn money. Eventually, Mr. Bandie succumbed to the allure of potentially making additional money through illegitimate means.

Mr. Bandie's friends taught Mr. Bandie how to scout potential victims, looking for middle-aged people who were more vulnerable to romantic advances. Using dating sites like Match.com and eHarmony, Mr. Bandie and his friends gained potential victims and entered into romantic, financial scams. Creating a fictional character, scammers would exchange messages with victims and coax money from the victims. Mr. Bandie contends that at no times has the United States alleged that he ever personally received any financial benefit from the alleged schemes.

While briefly participating in these scams, Mr. Bandie often thought about the victims' families and how they must be feeling. As his conscience weighed upon him, he kept the criminal activity secret from most people he knew. He knew it was wrong to trick innocent people out of their hard-earned savings. Mr. Bandie wrestled knowing his parents raised him to be an honest and honorable man, and he is devastated that he has failed them by his actions. Mr. Bandie contends that a variance below the guidelines range is warranted because overall, he is a law-abiding citizen who on this occasion, engaged in isolated acts of misconduct. *See United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (a six-level downward departure upheld where the district court concluded that the defendant was a "law abiding citizen who [did] an incredibly dumb thing" and was "not the type of defendant the guidelines section was designed to punish").

Mr. Bandie was motivated by the desire to provide continued support for his daughter. While this can never justify his illegal actions, Mr. Bandie understands that his actions have caused the victims in the instant case to feel betrayal and experience financial loss. He hopes that through his guilty plea, that other scammers would be cautioned and make better choices than he ultimately made. He remains deeply remorseful for his limited role in this conspiracy.

In 2020, Mr. Bandie changed his course and began working on a friend's political campaign to represent his constituency in the Ghanaian Parliament. Mr. Bandie had a new path forward, leaving behind all prior scamming work. He set the long-term goal of serving as a member of Parliament in his family's place of origin, the Nadowli Kaleo Constituency. Further, Mr. Bandie continued his legitimate farming business, expanding to fifty acres of farmland and now specializing in crops, meat, and fish products. He also founded "Arrow Express," a successful messenger and carrier service in Tamale.

Mr. Bandie contends that a downward variance is appropriate in this case because of his voluntary cessation of the crime before discovery. *See Gall v. United States*, 128 S. Ct. 586 (2007) (sentence of probation upheld in part because of defendant's voluntary withdraw from the conspiracy); *United States v. Workman*, 80 F.3d 688, 701 (2d Cir. 1996) (a two-level reduction upheld where defendant withdrew from a narcotics conspiracy and enlisted in the United States Army before he was indicted); *United States v. Nunemacher*, 362 F.3d 682 (10th Cir. 2004) (downward departure permissible where defendant possessed and distributed child pornography materials but destroyed them and ceased criminal activity before he knew of the investigation).

During this new season of life, Mr. Bandie made peace with his family and spent more time with his daughter. During this time, his daughter, Maalu, suffered a motorcycle accident, requiring

future reconstructive surgery to her legs in order to achieve a full recovery. After leaving behind online scamming, Mr. Bandie felt focused, productive, healthy, and optimistic about his future. Unfortunately, Mr. Bandie could not escape the consequences of his prior actions. To date, his daughter, Maalu, requires additional medical assistance and is need of surgery. Mr. Bandie contends that a long term of incarceration would prevent Maalu from obtaining the medical care she desperately needs, as her mother could not afford the surgery on her own. The financial challenges coupled with mental-health challenges experienced by Maalu's mother further warrant the need for a shortened length of incarceration for Mr. Bandie. Harriet Abaaro Akaba-Briamah, the mother of Mr. Bandie's daughter, writes in support:

> I plead with you to find it within your heart to have mercy and some leniency when you sentence Wigbert. He is a wonderful father with a kind heart. He is his daughter's best friend. Although he made these mistakes this does not describe his character. I am confident that, given another chance, he will do what is right to correct his mistakes and live a decent life. I can confidently say [I] would not have been able to [raise my daughter] on my own.

[Ex. 1, "Collective Letters of Support"].

In 2023, Mr. Bandie, while visiting New York on a holiday, was arrested by federal agents at the airport. Heartbroken, Mr. Bandie accepted responsibility for his actions and later pled guilty to Count One of the Indictment. Mr. Bandie intends to share his story to young people when he returns to Ghana, to encourage them to stay on the righteous path and avoid being drawn to online scams. He will share that a prison sentence is not worth the slight monetary advantage of adopting that destructive mindset. He understands that the toxic scamming culture corrupts young people and cut them off from the rewards of a moral life and looks forward to being an advocate for change. He has already began writing a book to highlight the consequences of his bad choices and the path to reconciliation and anticipates forming a non-profit organization to benefit the people of Upper

9

West Ghana, supporting initiatives to improve education, healthcare, and water access. Mr. Bandie's father, Dr. Boye Bandie, writes in support:

> He [Mr. Bandie] has also contributed to various causes in our hometown of Nator by making donations. An example is when he funded the establishment of a borehole to help give the people consumable water. Clean, accessible water was always a problem for the community. Now, both people from Nator and neighboring villages have access to clean water. His various philanthropic and volunteer contributions to the Naton community have not gone unnoticed. His good deeds have made him quite popular among the people.

[Ex. 1].

Mr. Bandie realizes that his actions were immensely wrong and would stress to the Court his deepest regrets for participating in the online scam, and that prior to his arrest, he had already left that life behind and has no intention of ever returning to any type of criminal activity. Mr. Bandie contends that his extreme and heartfelt remorse should weigh heavily for a downward variance in this case. *See United States v. Howe*, 543 F.3d 128 (3d. Cir. 2008) (finding the district court judge did not err in a probationary sentence with home confinement for wire fraud on a finding of "heartfelt remorse" from the defendant); *United States v. Stern*, 590 F. Supp.2d 945 (N.D. Ohio, Dec. 19, 2008) (where the district court imposed a 12-month sentence, varying downward from the 46 to 57 month guideline range where the defendant had remorse and manifested self-motivated rehabilitation before his arrest).

Mr. Bandie's girlfriend, Mary Ansah, write in support of Mr. Bandie's philanthropic efforts:

> Every year since I met him, on his birthday, 11th August, he makes me cook food to feed the needy and the children on the streets. When we initiated this project 3 years ago, we fed 120 people and the number goes higher each year. He makes provisions for a balanced meal with water and a soft drink which we give to the homeless, the needy and the children on the street. I was particularly amazed when he called this year to remind me of our annual charity to the streets despite his current situation

10

and while facing trial. He did not forget the streets and I believe that says a lot about his character. We sent out a little over 200 packs of food, water and drinks.

[*Id*].

Mr. Bandie contends that his outstanding character should weigh heavily on the Court for a downward variance. *See United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007) (affirming district court's imposition of a 70-month sentence, varying from a guideline range of 121 to 151 months in part because the defendant demonstrated he was a kind and caring individual who enjoyed broad support of family, friends, colleagues, and teachers).

## C. The Need for the Sentence Imposed to provide punishment, deterrence, incapacitation, and rehabilitation

Mr. Bandie acknowledges that he caused harm to others and to himself. With this in mind, a sentence of incarceration of not more than twenty-four (24) months is more than sufficient in this case to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. It should be remembered that:

> Respect for the law is promoted by punishments that are fair . . . not those that simply punish or punishment's sake. There is no reason to believe that respect for the law will increase if a defendant who deserved leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves harsh punishment receives a slap on the wrist.

*United States v. Stern*, 590 F. Supp. 2d 945, 956 (N.D. Ohio 2008).

Furthermore, the Supreme Court has agreed that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 522 U.S. at 54.

11

Pertaining to deterrence, courts have long interpreted this provision of Section 3553(a) to require consideration for both specific and general deterrence in regard to criminal behavior in society. First, for general deterrence, this Court should consider the lack of publicity associated with this case. The amount of publicity a case has received and will continue to receive should naturally and reasonably figure into an analysis of whether any given sentence will further the goal of demonstrating the detrimental costs to others of committing a similar crime. Where there has been little or no publicity, there can be little general deterrence to others. Mr. Bandie's case has received little to no publicity and would provide no future deterrence to other individuals. Therefore, granting a term of imprisonment downwardly varying from the guideline range would provide no detriment to general deterrent effects.

Imposing a sentence below the guideline advisory range would not thwart specific deterrence efforts for Mr. Bandie. Throughout his time on pretrial release since his arrest in 2023, Mr. Bandie has spent time self-reflecting and attending courses to better himself. In February 2024, Mr. Bandie began a thirteen-week program with The Focus Forward Project, Inc., whose goal is to provide participants with the confidence and practical tools to successfully move forward with their lives.

During his participation, class facilitators noted Mr. Bandie's "profound reflection, clear expression and self-discipline" and his ability to "remain positive and productive" "despite being so distant from family and friends in Ghana." It is Mr. Bandie's intent, as well as The Focus Forward Project's belief, that Mr. Bandie "has the capacity, both in terms of skills and motivation, to move forward as a productive member of society."

12

During his pre-trial release, Mr. Bandie furthered his personal and professional development by obtaining additional certifications that serve to reinforce his specific deterrence from future criminal conduct [Collective Ex. 2, "Certifications"]. Notably, on July 8, 2024, he successfully completed "Starter U," an entrepreneurship course offered by the Brian Hamilton Foundation, earning a certificate of completion. Additionally, he earned a certificate for successfully completing a course "Understanding Child Development and Disabilities."

For the same reasons noted above regarding specific deterrence, especially noting that upon arrest, Mr. Bandie had already absolved his participation in the illegal scheme three (3) years prior and that Mr. Bandie has continued to better himself through educational resources while on pretrial release, sentencing Mr. Bandie below the guideline range would not thwart the efforts to "protect the public from further crimes of the defendant." Additionally, Mr. Bandie asserts that at no time has the government alleged that Mr. Bandie received any financial gain from his brief participation in the offense. Moreover, empirical evidence does not establish a relationship between sentence length and specific deterrence. David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment).

Nevertheless, the need to protect the public from future crimes by Mr. Bandie is not an issue because he poses a low risk of recidivism. Mr. Bandie has no criminal history, which places him in a Criminal History Category I. As a first-time offender, Mr. Bandie poses a lower risk of recidivism. In imposing the least sentence possible sufficient to account for the need to protect the public from future crimes of Mr. Bandie, this Court should consider the statistically low risk of recidivism presented. *See United States v. Urbina*, slip op., No. 06-CR-336, 2009 U.S. Dist. 18239,

13

at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F.Supp. 2d 271, 279 (D. Mass. 2008) (granting defendant's request for downward variance because defendants with "zero criminal history points are less likely to recidivate than all other offenders."). Finally, the Court should consider the length of time that passed that Mr. Bandie abstained from criminal conduct after the commission of the instant offense—from 2019 until present.

Additionally, increased incarceration is not necessary to provide rehabilitation for Mr. Bandie, as he has shown the Court that he would voluntarily participate in rehabilitation programs, and it is his goal to continue his rehabilitation efforts after his term of incarceration. *See United States v. Traylor*, No. 20-1542, 2021 U.S. App. LEXIS 22765, at * 5 (6th Cir. July 30, 2021) (where the district court granted defendant's requested downward variance because of the defendant's rehabilitation efforts). Additionally providing him with training, treatment, or care is greatly minimized by the education and job experiences Mr. Bandie has previously enjoyed throughout his professional career. Although he has violated the law regarding his involvement with the instant case, he has nonetheless, from the extent of the information available, been a hardworking and useful member of society and eagerly anticipates rejoining his family and the workforce.

In support, Mr. Bandie's cousin, Ziemeh Bandie, writes:

I have seen firsthand the positive impact Mr. Wigbert Bandie has had on the lives of many, including those he works with, me included. He is a man of integrity, compassion, and unwavering support for those around him. It is not just his leadership and generosity that stand out, but also his ability to inspire and uplift others in their times of need.

[Ex. 1].

14

**D. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

A sentence varied below the guideline range would support the need to avoid unwarranted sentencing disparities. A sentencing judge's obligation to avoid sentencing disparities under §3553(a)(6) concerns national disparities between defendants with similar criminal histories convicted of similar crimes. *United States v. Wallace*, 597 F.3d 794 (6th Cir. 2010). Here, during the previous five (5) years, 222 defendants were sentenced with a Final Offense Level of 26 and a Criminal History Category of I. For the 215 defendants who did not receive substantial assistance departure under USSG §5K1.1, the average length of imprisonment imposed was forty-nine (49) months with a median term of imprisonment of forty-eight (48) months. Although Mr. Bandie, like these 215 other defendants, falls within the guideline range of 63 to 78 months, district courts frequently impose sentences below this range—averaging 49 months. Mr. Bandie respectfully requests that this Court similarly vary downward in this case.

**E. The need to provide restitution to any victims of the offense**

A sentence varied below the guideline range would also support the need to provide restitution to victims of the offense. An increased incarceration would deter and prolong Mr. Bandie from beginning payment of restitution, as ordered in this case, pursuant to 18 U.S.C. § 3663A, in the total amount of $2,180,923.00 [Doc. 75, ¶ 121-122]. Considering the significant restitution ordered, reducing Mr. Bandie's sentence would allow him to better contribute to restitution payments and enable him to begin making meaningful payments toward the significant restitution order. *See United States v. Musgrave*, 647 Fed. Appx. 529 (6th Cir. 2016) (affirming the district court's finding that "the goal of obtaining restitution for the victims is best served by a non-incarcerated and employed defendant").

15

Notably, the Government alleged in its sentencing memorandum that a sentence at the upper end of the guideline range is warranted, in part because it alleged "the defendant and co-defendant Braimah would assume the identities of actual victims and create fake social media accounts, impersonating these victims, to appear legitimate to potential future victims" [Doc. 79 at 3]. Furthermore, a similar claim appeared on the PSR, stating that "[s]ometimes, co-conspirators would assume the identifies of victims and create fake social media accounts to appear legitimate to potential future victims" [Doc. 75, ¶ 53]. Mr. Bandie points out to the Court that this allegation was not included on the Plea Agreement and was not stipulated to in the statement of facts presented [*See* Doc. 11]. Mr. Bandie reaffirms his position that his role and participation in the conspiracy were minor, and that the Government has not alleged nor provided proof that he personally received any tangible, financial benefit for his brief, minor role in the alleged conspiracy.

## CONCLUSION

Mr. Bandie desired to financially provide a comfortable life for his daughter. Motivated by this need to provide for her, Mr. Bandie briefly engaged in unlawful activity in the instant case at the behest of his friends. He realizes now that his irresponsibility and short-sighted actions have caused him to rest in his current position. He knows that he and he alone made the choices bringing him before this Honorable Court. He accepts full responsibility for conspiring to commit wire fraud.

When looking to the future, Mr. Bandie propounds that his goals are simple. He desires to fulfill his obligations to the Court, follow the terms of his sentence, and then move forward. No longer a prideful man, his days of unthoughtful behavior are behind him. With this in mind, Mr. Bandie humbly requests this Court sentence him to a period of incarceration of not more than 24

months, or in the alternative, at the bottom of the advisory sentencing guidelines. Such a sentence would be well sufficient to satisfy the goals of sentencing and to comply with the statutory directives set out in 18 U.S.C. § 3553(a).

Respectfully submitted this 25th day of October 2024.

Attorneys for Defendant

*s/ Nathaniel R. Ogle*
Nathaniel R. Ogle, BPR # 032286
Burks & Ogle
800 S. Gay St., Suite 1900
Knoxville, TN 37929
P: 865-522-4964
nate@knoxlegalteam.com

*s/ Charles C. Burks, Jr.*
Charles C. Burks, Jr., BPR # 000956
Burks & Ogle
800 S. Gay St, Suite 1900
Knoxville, TN 37929
P: 865-522-4964
cburks@knoxlegalteam.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent electronic notification of such filing to all parties listed on the Electronic Case Filing (ECF) System.

17

Dear Judge Varlan,

I am writing to you in my capacity as a childhood friend to the Defendant Wigbert Bandie, to offer my sincere support for him as he stands before the court. I have known Wigbert for the better part of the last 25 years, and I wish to provide a character reference based on our long-standing relationship.

Throughout our friendship, Wigbert has consistently demonstrated qualities of honesty, integrity, and compassion. From a young age, he has shown a remarkable commitment to his community and has always been someone others could rely on. For instance, on several occasions when fellow northern friends travel to Accra which is the capital of Ghana and were stranded in one way or another, he provides them with temporal accommodation and even feeds them for the while that they live with him until they land a job or secure some steady flow of income. During a particularly challenging period in my life, where I was involved in a car accident which claimed the life of a mutual friend, Wigbert offered unwavering support and guidance, helping me through that very difficult time with a lot of kindness and empathy.

Wigbert has also contributed positively in various ways. He was actively involved in my cousin's political campaign primaries when he was running to become a Parliamentary Candidate for the Tolon constituency which is in the Northern Region in Ghana and also participated in the campaign leading up to the 2020 general elections of which my cousin in the person of Habib Idrissu who got elected to the high office of Member of Ghana's 8th Parliament, reflecting his dedication to making a positive difference in the lives of others.



EXHIBIT

In addition to his charitable work in his small ways, Wigbert has consistently displayed a strong sense of responsibility and respect for others. He worked tirelessly and selflessly with me on a road contract to rehabilitate some roads that were in a very deplorable state in the Northern Region. We were able to secure that contract through the help of my cousin. He is known among our circle of friends and family for his reliability and integrity, traits that I believe are indicative of his true character.

I understand the seriousness of the matter at hand and do not intend to diminish its importance. However, I firmly believe that Wigbert has the capacity for growth and redemption. He is a person who has made mistakes but also possesses the potential for positive change and a desire to make amends.

Thank you for taking the time to consider my perspective. I hope that this letter provides some insight into Wigbert's character and the positive qualities he brings to those around him. I am confident that he will use this experience as an opportunity for personal growth and to continue contributing positively to society.

Yours Sincerely,

Abdul Rahman Mohammed Nazeer

**TO WHOM IT MAY CONCERN**

## TESTIMONIAL ON WIGBERT MWINWIEMAH BANDIE

My name is Robinson Dakubu Boye Bandie (PhD), affectionately called Dr. Boye Bandie. I am a native of Nator in the Nadowli-Kaleo District of the Upper West Regin of the Republic of Ghana. I am 67 years old and a retired public servant. I am the biological father of WIGBERT MWINWIEMAH BANDIE and write to testify on his character and integrity.

WIGBERT MWINWIEMAH BANDIE was born to me and my lawful wife, Emilda Delaara, on the 11th of August 1990. He is the second of our three children. Our family is a very Christian one, and together with my wife, we thus strived to bring up our children, including Wigbert to live lives of the highest moral standards, virtue, and above reproach. Indeed, the accepted and practiced principle among all family members is the promotion of glory and good name for self and family.

WIGBERT MWINWIEMAH BANDIE's disposition is particularly unique among his siblings. He believes in and practices honesty, truthfulness and righteousness. He is also selfless, kind, generous and very caring. In my particular case, I have been battling a stroke attack for almost a decade (since February 24, 2015), and while in Ghana, Wigbert was always there for me. Aside from providing financial, material and emotional support, he moved to Wa right after my stroke to take care of me for a couple of months. At that time, he lived in Accra, the capital city which is about 420 miles apart. He was the only one out of his siblings to do this. This meant a lot to me. Especially because we did not have a good relationship prior. When the stroke happened, I could barely do anything on my own and I was dependent. He helped me however he could and never complained or made me feel like a bother. He was always gentle and went out of his way to do things. This truly is the character of Wigbert. He has always been a good kid.

Indeed, his absence over the last nine months has created a big void in my life. Since falling ill and going on retirement, he always makes sure both his mother's needs and mine are taken care of, all while taking care of his sick daughter. Years ago, I helped him lease acres of land from local chiefs for farming purposes. He has been actively involved in this and has done so well for himself over the last 5 years. I am a first-hand witness to the growth and success of his farming endeavors.

He has also contributed to various causes in our hometown of Nator by making donations. An example is when he funded the establishment of a borehole to help give the people consumable water. Clean, accessible water was always a problem for the community. Now, both people from Nator and neighboring villages have access to clean water. His various philanthropic and volunteer contributions to the Nator community have not gone unnoticed. His good deeds have made him quite popular among the people, with some calling for him to contest for the parliamentary seat in the future. He is easily exposed by his good conduct and character and thus

readily assigned leadership roles among his peers. From middle school through to the university and beyond, he has always held a leadership role in one capacity or another.

It is however heartbreaking to hear that he ever got involved in criminal behavior. His mother and I feel let down. Since his arrest in the USA, we have spoken with him. He admitted to going against his morals when things got tough in the past, but he is back on the right path and has stopped his involvement in these schemes. People make mistakes. Respectfully, in my opinion, learning from mistakes and never repeating them is essential for personal and communal progress. There is no excuse for his past behavior. I however implore the court to show some leniency to my son. He had a troubling past which I believe led him to act out of character. I am proud that he has overcome all the adversity to become the man that he is today. He always accepts responsibility, never makes excuses, and always is the first to admit when he is wrong. I know he genuinely made mistakes he greatly regrets, mistakes he will have to live with for the rest of his life. I vouch for his character and integrity that he will never repeat such behavior. I am available and very willing to provide any further information as and when needed. Thank you.

**Signature:**..............................

Date: 1st September, 2024

**Name:** R. D. Boye Bandie (PhD)

Dear Judge Thomas Varlan,

My name is Ziemeh Bandie, and I am writing to provide a character reference for Mr. Wigbert Bandie, my cousin. I have had the privilege of working closely with him as the overseer of his farming business and courier services.

After graduating from university in 2016, I encountered several challenging years of unemployment. It wasn't until 2021 that my cousin extended a lifeline by offering me a position in his farming business and courier services in the northern part of Ghana. His belief in me provided the opportunity not only to support myself but also to contribute to the growth of his business.

Under my cousin's leadership, the farm and courier service have experienced significant growth. Until operations were halted this year, he employed twenty-nine individuals in various roles, ranging from laborers to dispatch riders. He is a leader who genuinely cares for his team, consistently demonstrating a willingness to listen and actively engage with us. He doesn't just manage from a distance; he joins us in the field, working alongside us whenever he visits, which has earned him deep respect and admiration from everyone.

In addition to his professional guidance, Mr. Wigbert Bandie has demonstrated remarkable personal generosity. Recognizing the demands of my role, he purchased a motorbike to facilitate my rounds, enabling me to perform my duties more efficiently. This thoughtful gesture is just one example of his commitment to supporting those around him.

I have seen firsthand the positive impact Mr. Wigbert Bandie has had on the lives of many, including those he works with, me included. He is a man of integrity, compassion, and unwavering support for those around him. It is not just his leadership and generosity that stand out, but also his ability to inspire and uplift others in their times of need. For these reasons, I ask you to consider the true nature of his character, a person who has been a pillar of strength for so many people.

Thank you for your time and thoughtful consideration.

Yours Sincerely,

*[signature]*

(Ziemeh Bandie)

Dear Judge Thomas Varlan,

I hope this letter finds you well. I am writing to provide a character defense for Wigbert Bandie, with whom I share a daughter with. As someone who has spent the greater part of the last 9 years knowing him, I would like to describe what we have been through over the years to highlight his positive contributions and character in both my daughter and my life.

I met Wigbert in the early months of 2015, when his father had a stroke and was bedridden. My mother and his father have been good friends so when the unfortunate happened, it was only right that we go pay his father a visit. It was during this time that I met Wigbert for the first time, as he was taking care of his dad.

Wigbert and I started talking and developed a friendship which later led to a romantic relationship. I got pregnant along the line and we welcomed our daughter in February 2016. After the birth of our daughter, we had certain personal problems between us and communication between he and I was not so good. This led to a breakup in the relationship. Although that happened, Wigbert made it a point to still be in his daughters' life. He frequently visited her and provided for both his daughter and I. He has always taken care of all her needs, be it educational, health, social and the general wellbeing of both of us. He never made our differences come between his relationship with his daughter and his responsibilities towards us.

In 2019, a motorcyclist run into Maalu (our daughter- as we all call her) and caused damage to her right leg. It was so bad that she had to undergo surgery. After surgery, we were not satisfied with the results. Maalu was in the hospital for about 2 months and Wigbert practically put his life on hold and came to the town were Maalu and I live to be close to his daughter and visit her in the hospital every single day. There were times he had to go and take care of business but he was always back within a day or two. This really impressed me because I saw how much he loved and genuinely cared for our daughter and how sad it made him whenever she was in pain or asked if her leg was going to be cut off. He always assured her that was not going to happen.

The recovery process was tough for Maalu as she was constantly in pain and walked with a limp. It caused her to be ridiculed by some of her school mates. This is something that deeply bothered us, and made Wigbert go to her school on several occasions to have the teachers caution the students about such behavior. Indeed, he has empathy. Sometimes I eavesdrop on their father daughter conversations and I am always happy about how he encourages her and tells her not to let this bother or define her.

In 2021, we decided again to have reconstructive surgery on Maalu to help rectify her leg problem as the ridicule was getting out of hand and we did not want her growing up feeling different. Sadly, things did not go as we expected and rather made things worse. This was another devastating blow to us as we had spent so much time and money to no avail. This took a toll on both Wigbert and I as we had run out of ideas and did not know what to do again. I fell into depression and had some very dark thoughts. I spent days crying and wouldn't come out of my room. But through it all, Wigbert always found the strength to keep encouraging me that

everything will be fine eventually and also signed me up for therapy. This went a long way to help my mental health.

We decided last year to save up and take Maalu abroad, where we felt she will be cared for better. He started to research to find the best surgeons worldwide. Shortly after, we were informed about the excellent work being done by medical staff at the fairly new state of the art medical center in Accra called the University of Ghana Medical Center (UGMC). At this point we lost confidence in the Ghana medical system. We visited UGMC together and had discussions with some stakeholders and surgeons of the institution. We were still deciding on the next steps to take when he had to travel to the USA.

Right now, all our plans have been put on hold because of his ongoing case in your court. The father of my daughter deserves to be punished. It is never a good thing to take advantage of people for financial gain. Like I told him, his karma has caught up with him and he must face whatever comes his way. At the same time, I plead with you to find it within your heart to have mercy and some leniency when you sentence Wigbert. He is a wonderful father with a kind heart. He is his daughter's best friend. Although he made these mistakes, this does not describe his character. I am confident that, given another chance, he will do what is right to correct his mistakes and live a decent life. I can confidently say would not have been able to do this on my own. He has been very supportive in every aspect and that is why I feel I needed to write this letter to you.

Sorry for writing such a lengthy letter your honor. I could not decide what to leave out. Thank you.

God bless you.

Harriet Abaaro Akaba-Briamah

Dear Judge Varlan,

I am writing to you regarding my boyfriend, Wigbert Bandie, who is currently before your court. I have had the privilege of knowing Wigbert for 4 years as his girlfriend and lover. Wigbert has been nothing short of an amazing partner and I can confidently say that during the time we have been together, I have come to know him as a loving, kind, responsible, and a genuinely caring individual. He always encourages people to aim higher and try to reach their full potential. I remember during the time we met, I had a diploma but he told me he wanted to see me grow and encouraged me to get a degree. So, being who he is, he supported my education to upgrade to a bachelor's degree. This gesture was very personal to me because it takes a very thoughtful man and a man who sees outside of the box to want to develop his woman, a woman he is not yet married to.

Wigbert is always willing to lend a helping hand whenever he can. A few years ago, I took ill and was admitted at the hospital for food poisoning. In the same ward as me was an aged woman whose only relative around at the time was her 15 year old nephew. The woman suffered a history of diseases and was also crippled. Wigbert was touched and wanted to offer any help he could. I made enquiries from the nurses and I found out the woman could really use a wheel chair. The day I relayed this information to him, he came to pick me up from the hospital after being discharged and bought the woman a new wheelchair and gave her some cash as well. I could tell that she really appreciated it as it made movement easier for her. She couldn't stop thanking and blessing him. He kept in touch with her nephew and still offered help from time to time.

Again, I had lost one of my younger twin brothers and my family was going through a difficult time a couple of years ago. Wigbert offered support and comfort in ways that went above and beyond what my family expected. He acted like a family man and as someone who valued the family system. He always offers a helping hand and expects nothing in return, and I believe that is one of the things that makes people love him.

One trait that is worth mentioning is Wigbert's Selflessness. I am into catering and hospitality and so I make meals for events. Every year since I met him, on his birthday, 11th August, he makes me cook food to feed the needy and the children on the streets. When we initiated this project 3 years ago, we fed 120 people and the number goes higher each year. He makes provisions for a balanced meal with water and a soft drink which we give to the homeless, the needy and the children on the street. I was particularly amazed when he called this year to remind me of our annual charity to the streets despite his current situation and while facing trial. He did not forget the streets and I believe that says a lot about his character. We sent out a little over 200 packs of food, water and drinks. I have attached some pictures.

Beyond his philanthropic endeavors, Wigbert is a caring father. Not only to his daughter but to his workers and those who ever have the chance to cross paths with him. He will always offer a helping hand if it is within his means. He fosters a supportive and nurturing environment, ensuring everyone around him feels valued and appreciated. His leadership qualities and

genuine concern for the well-being of others makes him a great roll model. Going through what he went through in the past and still being able to turn his life around for the good is something I am so proud of about him. His workers love him. His family loves him. My family love him. And anyone who gets close to him ends up seeing just how much of a nice kindhearted person he is. I may sound biased but he truly has a wonderful soul.

Please take into consideration the person I know Wigbert to be—a person with a good heart, who is capable of change and deserving of a second chance. Even before he got into trouble with the law, we discussed extensively things that happened in our past and this was one of the things we was not proud of ever getting involved in and was very happy that he was able to get out, as he has always expressed his desire to run for office someday. I truly believe that with the right support and guidance, he will continue to grow and make positive contributions to our community.

Yours faithfully,

Mary Ansah.

Dear Judge,

I am writing to offer a character reference for my friend, Wigbert Bandie, who is currently residing with my family in New York, while out on bail.

I have had the privilege of knowing Wigbert since 2010, and throughout of friendship, I have witnessed his unwavering commitment and diligence. Since getting to know him, this is the first time we have spent this much time living together, and I have gotten to know more about him in the past 10 months. He has practically become part of my family, as my mother considers him a son and my brother and I consider him as one of ours.

Despite facing personal challenges, Wigbert has consistently demonstrated exceptional empathy and support wherever he can. His genuine compassion and readiness to assist is very evident. He helps around the house every chance he gets.

Additionally, Wigbert is not only industrious but also a devoted father to his daughter. His dedication to his family is admirable. Although his daughter is thousands of miles away, he still does his best to create a nurturing and conducive environment for her. I see him spend hours at times on the phone talking to her, either helping her with her homework or playing various games with her. He constantly tells her about how special and beautiful she is and it is always just so sweet to hear.

Throughout his stay with us, he has conducted himself with the outmost respect and maturity. My family and I wholeheartedly attest to his integrity and upstanding moral character, and we are confident he will continue to positively influence those around him.

Although we are age mates, I have no kids of my own. But if I ever do, I will want to be an outstanding father like Wigbert is. He is a wonderful role model. I admire how he raises his daughter and keeps encouraging her to do well at school and be all that she can be. To him, nothing is impossible for his daughter's reach as long as she believes in herself, and I think these are things parents need to instill in their kids.

I have heard him over the phone try solving problems for people back home in Ghana while going through this tough time. I honestly wonder how he does it. A lot of people look up to him and respect him because of these qualities he possesses. I have grown to have a lot of respect and admiration for him.

During his house arrest, he has abided by all the rules that have been set for him. I see him do a lot of praying, reading and partaking in educational courses. He is making the best of an unfortunate situation.

I understand the victim impact of this ordeal honorable judge, but I am pleading with you to give him another chance to correct this wrong. He stopped involving himself in these illegal schemes years ago and that gave him to confidence to travel here. Sadly, crime has no expiry date. But I honestly believe he is a rehabilitated person and just wants to do what is best for himself and his family, especially his daughter. He is very aware of his mistakes and truly regrets the actions of his past. He knows his self-worth and knows he is a better than his past. He just got involved with the wrong people at a very desperate time in his life.

Thanks

Nabill Ellias



# THE FOCUS FORWARD PROJECT, INC.

P.O. Box 2892, Church St. Station, New York, NY 10008-2892 | Tel: (347) 619-2080 | info@focusforwardproject.org

**Pamela Miller**
*Executive Director*

**BOARD OF DIRECTORS**

Anne Patterson Finn
*Chairperson*

Amy Finzi

Alexandra Katz

Justine Kentla

Joel Putnam

Catalina Rappaport

Deirdre von Dornum

July 19, 2024

Honorable Thomas A. Varlan
United States Courthouse
800 Market Street, Suite 143
Knoxville, Tennessee 37902

Dear Judge Varlan:

We write in our capacity as volunteer facilitators of the Focus Forward Project in support of Wigbert Bandie, a graduate of a recent Focus Forward class that began on February 21, 2024. The Focus Forward Project is a nonprofit organization dedicated to providing an educational curriculum focused on reentry for individuals charged with federal crimes.

Our classes are offered for people who are incarcerated and for those under pretrial supervision. The 13-week course is designed to provide both an intellectual and emotional outlet for participants as they navigate the stress and uncertainty of the pretrial phase of their federal cases. The class meets once a week for two hours, and participants complete weekly reading, journal, and other homework assignments. The first half of each class is spent discussing and connecting with themes in the memoir, A Long Way Gone, by Ishmael Beah, who was a boy soldier in the Sierra Leone civil war, while the second half of each class focuses on life skills, highlighting a different skill each week.

By the end of the course, participants will have gained a variety of transferable skills and tools, including, but not limited to: a completed resume, interview skills, conflict resolution skills, public speaking skills, and the setting of both short and long-term goals. The goal of The Focus Forward Project is to provide participants with the confidence and practical tools to successfully move forward with their lives.

Over the duration of the course, we were struck a number of times by Wigbert's capacity for profound reflection, clear expression and self-discipline. He was a thoughtful and hardworking member of our class, who — both by his actions and words — exhibited his sincere commitment to our program, which he joined "to interact with others and hear about their ideas and experiences." Each week, Wigbert dependably arrived to our Zoom class early or on time, completed his assignments to a high standard, listened closely to the class discussion, and offered thoughtful



EXHIBIT
2

and insightful comments both about the journal topics and the assigned reading. We were impressed by the thoughtfulness of his weekly journal entries as well as his close reading of A Long Way Gone, particularly his ability to identify its important themes and motifs, and find parallels with civil strife he has witnessed in Ghana.

The success of the Focus Forward Project hinges in part on the willingness of our students to participate in class and engage in conversations about the subject matter. With his calm, earnest demeanor and his ability to express himself clearly and directly, yet with warmth and in an engaging manner, Wigbert was an integral member of the class and contributed to its positive class dynamic. In each class he extended himself by volunteering to read aloud his journal reflections, and by offering constructive and encouraging responses to the observations of his classmates. Furthermore, Wigbert volunteered to lead class discussions, which entailed preparation in advance, and which he accomplished in an organized and thorough manner. Wigbert's classmates looked up to him and appreciated his thoughtful and well-expressed comments and writing.

Wigbert spoke candidly about struggling with his current predicament and his efforts to find ways to remain positive and productive. He acknowledged that during the months we met as a class, he spent a lot of time contemplating how "to do things differently, change certain ways and avoid certain individuals and groups." While at times he felt discouraged and low emotionally, Wigbert would always pivot and speak of his determination to take steps to stay positive and build a constructive future, emphasizing "I can't change the past but I can change the future."

Each week, we witnessed Wigbert's determination and disciplined approach to staying hopeful, despite being alone and so distant from family and friends in Ghana. He described the routine he developed to stay positive, including waking at the same time each morning, engaging in a daily exercise regime, and writing for a designated period of time each day. As part of a public speaking exercise, Wigbert delivered a well-crafted speech focusing on the importance of meeting challenges. He described how, despite the intense fear of heights he had as a young man, he took a hike with friends up Ghana's highest mountain and made it to the summit. He recounted how with each step his confidence in his ability to reach the summit grew and how the experience taught him to face his fears and made him aware of "the strength that lies within when we face challenges."

When we assisted Wigbert with updating his resume, we learned about his educational achievements, such as his degree from the University of Ghana, as well as his steady employment history, including his ongoing agricultural trading business and farm, currently being tended by a cousin. He was very clear that going forward, it is important to make

money in the right way, "within the legal framework of the law, so that you can provide for your family and sleep well at night."

For Wigbert, family members play an important role in his life, and they motivate him to be as positive as possible and work towards a productive future. In class, as part of the discussion of the highs and lows experienced by class members each week, Wigbert often mentioned his intense desire to see his eight-year-old daughter and her mother, both of whom live in Ghana. A good telephone conversation with them would be the "high" for his week. Conversely, his "low" often involved his worries about being absent from his family and home. In addition, Wigbert spoke of his father, citing him as his most important source of inspiration. "His resilience is a reminder that every challenge is a chance to become better, and every interaction is an opportunity to spread kindness. He inspires me to be more present, more compassionate, and to remember that every day is a new chance to make a positive impact."

Based on his contributions to our class over the thirteen weekly sessions, we believe that Wigbert Bandie has the capacity, both in terms of skills and motivation, to move forward as a productive member of society. We consider Wigbert an important, committed member of our Focus Forward class, who applied himself consistently each week and significantly contributed to a positive class dynamic.

Your Honor, our intent is to provide you with our experience with Wigbert Bandie. We appreciate the time Your Honor has taken to read our letter. If you have any questions, please feel free to contact our supervisor at the Focus Forward Project by phone or email: (347) 619-2080 or info@focusforwardproject.org.

Sincerely,

Lori Fields
Lori Fields
Focus Forward Project
Class Facilitator

Anne Patterson Finn
Focus Forward Project
Class Facilitator

# STARTER U

The Brian Hamilton Foundation hereby certifies

## Wigbert Bandie

has completed the Starter U online
entrepreneurship course on

### July 8, 2024

Brian Hamilton
Founder, Brian Hamilton Foundation

BH

BRIAN
HAMILTON
FOUNDATION



THE
FOCUS
FORWARD
PROJECT, INC.

# CERTIFICATE OF ACHIEVEMENT

This certifies that

## Wigbert Bandie

has successfully completed all of the requirements for graduation from

## The Focus Forward Project

and is hereby awarded this certificate of distinguished achievement

May 29, 2024

Alexandra Katz, Esq.
Co-Founder

Justine Kentla, Esq.
Co-Founder

Pamela T. Miller, Esq.
Executive Director



**Alison**

EMPOWER YOURSELF

## CERTIFICATE

**WIGBERT BANDIE**

has received this award for successfully completing the course:

## Understanding Child Development and Disabilities

To verify:



2827-41846651

https://alison.com/certification/check/09a2f6f432

*Maeve Richardson*

Director of Certification



**CPD CERTIFIED**
The CPD Certification Service

**2nd September, 2024**

Date of Award

